UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re:                                                                    Chapter 11

EXCELL COMMUNICATIONS, INC.,                      Case No. 8-25-71444-las

                            Debtor.
-------------------------------------------------------x

**OBJECTION OF CREDITOR WORKFORCE7, INC. TO DEBTOR'S CRITICAL VENDOR MOTION**

        Workforce7, Inc. ("Workforce7"), a pro se creditor in the above-captioned Chapter 11 bankruptcy case, by its representative Ronald Hilton, Chief Executive Officer, respectfully submits this objection to the Critical Vendor Motion (the "Motion") filed by the Debtor, Excell Communications, Inc. (the "Debtor"), on April 14, 2025, and scheduled for a hearing on April 22, 2025. For the reasons set forth below, Workforce7 requests that the Court deny the Motion or, in the alternative, modify it to protect the interests of all creditors, including Workforce7.

**I. Background**

1.        Workforce7 is a creditor in this Chapter 11 case, holding an unsecured claim in the amount of $709,000 based on the Debtor's breach of two contracts for the provision of flagging services.

2.        Original Contract: Workforce7 entered into a contract with the Debtor, signed on July 14, 2022, to provide flaggers for the Debtor's operations. The Debtor failed to make any payment, owing Workforce7 $1,069,000, breaching the contract, **see Exhibit A**, original contract.

3.        Renegotiated Contract: In June 2024, in an attempt to recover payment, Workforce7 agreed to renegotiate the contract, reducing the amount owed by $69,000 to $1,000,000. The renegotiated contract required the Debtor to pay back Workforce7 in six (6) monthly installments, with a first monthly installment of $200,000 and the remaining five (5) monthly installments of $160,000 each. The Debtor paid the first two (2) monthly installments for a total of $360,000, but has not made any further monthly payments, breaching the renegotiated

1

contract, **see Exhibit B**, renegotiated contract.

4. Total Claim: Workforce7 asserts that, due to the Debtor's breach of the renegotiated contract, Workforce7 is entitled to: (a) the $640,000 balance owed under the renegotiated contract; and (b) the $69,000 reduction from the original contract, which Workforce7 conceded in good faith but is now owed due to the Debtor's failure to honor the renegotiated terms. Thus, Workforce7's total claim is $709,000.

5. On or about April 14, 2025, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

6. The Debtor filed the Critical Vendor Motion, seeking Court approval to pay certain creditors designated as "critical vendors" in unspecified amounts prior to the confirmation of a Chapter 11 plan.

7. Workforce7 has not been designated as a critical vendor, despite providing essential flagging services to the Debtor for a total of $1,069,000. The Motion, if granted, would adversely affect Workforce7's rights by reducing the funds available in the bankruptcy estate for distribution to creditors like Workforce7.

## II. Objection to the Critical Vendor Motion

8. The Debtor's Critical Vendor Motion should be denied because it fails to meet the requirements under the Bankruptcy Code and applicable law for authorizing prepetition payments to select creditors. Specifically:

    a. Lack of Justification for Critical Vendor Status: The Debtor has not provided sufficient evidence that the designated vendors are truly "critical" to its ongoing operations. In contrast, Workforce7 provided essential flagging services that were integral to the Debtor's operations, yet Workforce7 has not been designated as a critical vendor,

suggesting arbitrary or unfair selection criteria.

b. Unfair Preference to Certain Creditors: The Motion unfairly prioritizes certain unsecured creditors over Workforce7, which holds a substantial claim of $709,000 based on the Debtor's repeated breaches of contract. Paying other creditors ahead of Workforce7 violates the Bankruptcy Code's priority scheme under 11 U.S.C. § 507 and undermines the principle of equitable distribution.

c. Depletion of Estate Assets: The proposed payments to critical vendors would deplete the bankruptcy estate, reducing the funds available to satisfy Workforce7's $709,000 claim and hindering the Debtor's ability to propose a feasible Chapter 11 plan under 11 U.S.C. § 1129.

d. Debtor's History of Bad Faith: The Debtor's failure to pay Workforce7 under both the original and renegotiated contracts demonstrate a pattern of bad faith. The Debtor accepted Workforce7's services, renegotiated the debt to secure a $69,000 reduction, and then defaulted on all monthly payments, leaving Workforce7 with a $709,000 unpaid claim. Granting the Motion would reward the Debtor's bad faith by allowing it to pay other creditors while ignoring Workforce7's claim.

e. Lack of Transparency: The Motion does not adequately disclose the criteria used to select critical vendors, the specific amounts to be paid, or how the payments will benefit the estate as a whole, preventing creditors like Workforce7 from assessing the fairness of the proposed payments.

9. The Debtor has not demonstrated that the proposed payments are necessary to preserve the value of the estate or that alternative measures are insufficient.

10. Granting the Motion would severely prejudice Workforce7, which has already suffered

significant financial harm due to the Debtor's nonpayment of $709,000, and would further erode the estate's ability to satisfy legitimate creditor claims.

### III. Legal Basis for Objection

11.     The Bankruptcy Code does not expressly authorize prepetition payments to critical vendors. Courts have allowed such payments only in limited circumstances, requiring the Debtor to show that the payments are essential to the reorganization and benefit the estate as a whole. See, e.g., In re Kmart Corp., 359 F.3d 866 (7th Cir. 2004) (requiring strict scrutiny of critical vendor payments).

12.     The Debtor's Motion fails to meet this standard, as it does not demonstrate that the proposed payments are necessary or that the designated vendors are indispensable to the Debtor's operations.

13.     Additionally, 11 U.S.C. § 503(b)(9) allows administrative expense claims for certain prepetition goods delivered within 20 days of the petition date, but the Motion exceeds this scope by seeking to pay vendors for claims outside this period or without proper justification. Workforce7's claim, while not within the 20-day period, underscores the inequity of prioritizing other vendors over a creditor with a substantial, well-documented claim.

14.     The Debtor's proposal to pay critical vendors while ignoring Workforce7's $709,000 claim violates the Bankruptcy Code's goal of equitable treatment of creditors and the requirement that the Debtor act in good faith under 11 U.S.C. § 1129(a)(3).

### IV. Request for Relief

**WHEREFORE**, Workforce7, Inc. respectfully requests that the Court:

    a. Deny the Debtor's Critical Vendor Motion in its entirety; or

    b. In the alternative, modify the Motion to: (i) include Workforce7 as a critical vendor

entitled to payment for its essential flagging services, or (ii) limit payments to vendors proven to be truly critical and ensure equitable treatment of Workforce7's $709,000 claim;

c. Grant such other and further relief as the Court deems just and proper.

## V. Reservation of Rights

Workforce7 reserves the right to supplement this objection with additional arguments or evidence as further information becomes available and to raise additional objections to other motions or actions in this case.

Dated: April 16, 2025
      Bronx, New York

    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my personal knowledge and information.

                A facsimile or electronic signature on this document shall have the same effect as an original signature.

Respectfully submitted,

*Ronald Hilton*
Ronald Hilton
Chief Executive Officer
Workforce7, Inc.
4226A White Plains Road, 3rd Floor
Bronx, NY 10466
(347) 630-1399
ronald@workforce7.com

**cc: via efile EDNY**

Ruskin, Moscou, Faltischeck, P.C.
Michael S. Amato, Esq.
1425 RXR Plaza, East Tower, 15th Floor
Uniondale, New York 11556
(516) 663-6600
mamato@rmfpc.com
*Debtors' proposed counsel*

5

# EXHIBIT A

# Original Contract
# Attached is a true and correct copy of the contract between Workforce7, Inc. and Excell Communications, Inc., signed July 14, 2022, for flagging services, services rendered totaled $1,069,000



4226a White Plains Road 3rd Fl
Bronx, NY 10466
Ph: (347) 630-1399

## CONTRACT AGREEMENT

To:

    Excell Communications

    111 Express Street,
    Plainview, NY 11803

Subcontract #:
Date: 07/13/2022

Job   Altice Various Locations

**Description:** Traffic Control Services

Scope of Work:

Includes furnishing and supervising qualified and certified traffic control technicians in trucks and vehicles with the Company logo on the car. All vehicles will be equipped to set up a work zone with 15 cones, Flagger ahead signs, and an amber flashing strobe light. All personnel reporting to work with all appropriate signaling devices, including stop/slow paddles, safety gear including but not limited to reflective vests, hard hats, and or other required uniforms to accomplish safe movement of vehicular and pedestrian traffic as required by all Local, New York State or other appropriate governing body.

Rates unit price

| Location | Regular | Overtime & Holidays | Weekends |
|---|---|---|---|
| NY- Rockland County Area | $50 | $75 | $75 |
| NY-Yonkers | $45 | $67.50 | $67.50 |
| NY-Montauk (Lodging applies) | $68 | $102 | $102 |
| NY-Long Island | $60 | $90 | $90 |
| New Jersey | $60 | $90 | $90 |

**Holidays Observed**
New Year's Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Thanksgiving Day, Christmas Day

_____  _____   _____  _____
Excell Communicatons        Date     Workforce7 Inc              Date

# Workforce7 Inc.

## AGREEMENT

This Agreement is made on June **13, 2022**, for one year by and between the

SUBCONTRACTOR:                   Workforce7 Inc.
                                 4226a White Plains Rd
                                 Bronx, NY 10466

and the
CONTRACTOR:                      Excell Communications
                                 111 Express Street
                                 Bronx, New York 10466

for services in
connection with the
SUBCONTRACTOR WORK:              Traffic Control Services

for the following
PROJECT:                         Altice -Various NY/NJ Locations

Contractor, and Subcontractor, each with offices at the addresses shown above, agree for themselves, their successors and assigns as follows:

### TERMS ARE AS FOLLOWS:

The quotation is for flagging services and includes Stop slow paddles, 15 cones per vehicle, and flags as needed. Additional charges may apply if an arrow board and other specialty equipment are required.

Cancellation Fee. Any cancellations 8 hours or less before the start time of scheduled work will receive a cancellation fee of 4 (four) hours of straight time pay. Cancellation after the scheduled start time you will be billed at a minimum of 8 hours.

Termination of Subcontract. Either party hereto may terminate this subcontract at any time by giving not less than thirty (30) days' prior written notice to the other party. Termination shall only affect the term of this subcontract and shall otherwise be without prejudice to the rights of the parties hereunder.

Lodging reimbursement (only applies to Montauk). Contractor shall authorize lodging, meal expense reimbursement by Subcontractor for living expenses of Subcontractor's employee while assigned to Company's business/projects that require Subcontractor's employee to temporarily relocate from their permanent/home base residence. Contractor must authorize in advance prior to Subcontracted dispatching its employees to location.

PAYMENTS & TERMS

1. TERMS

   a. Payment shall be made by Contractor to the Subcontractor within thirty (30) days of the invoice date.

   b. Invoices shall be submitted to Contractor Accounts Payable Department on a weekly basis, after the rendering of the services for which payment is to be made.

2. PRICE. Contractor shall pay to Subcontractor, for the satisfactory performance and completion of the Work and performance of all the duties, obligations and responsibilities of Subcontractor under this Subcontract, the sum set forth above as the Price pursuant to a trade payment breakdown approved by Contractor, subject only to additions and deductions as expressly provided in this Subcontract. To the extent that the Work is to be performed on a unit price basis, the Price shall be computed in accordance with the unit prices set forth in this Subcontract, based on actual quantities determined in accordance with the Contract Documents and this Subcontract. The Price and all unit prices shown in Subcontract # shall be deemed to include all costs of Subcontractor's performance of the Work as set forth in the Contract Documents, including, but not limited to, the costs of labor, supervision, services, transportation, insurance, taxes, and all overhead and profit.

3. NOTICES. All written notices provided for in this Subcontract or in the Contract Documents shall be deemed given if delivered personally to the party or sent by email or by certified or registered mail, return receipt requested, to the party at its address specified herein and to the attention of the representative specified herein. Either party may from time to time, by notice to the other as herein provided, designate a different address and or representative to which notices to it should be sent.

4. SUBMITTALS. The Subcontractor promptly shall submit for approval to the Contractor all shop drawings, product data, manufacturers' literature and similar submittals required by the Subcontract Documents. The Subcontractor shall be responsible to the Contractor for the accuracy and conformity of its submittals to the Subcontract Documents. The Subcontractor shall prepare and deliver its submittals to the Contractor in a manner consistent with the Progress Schedule and in such time and sequence so as not to delay the Contractor or others in the performance of the Work. The approval of any Subcontractor submittal shall not be deemed to authorize deviations, substitutions, or changes in the requirements of the Subcontract Documents unless express written approval is obtained from the Contractor and Owner authorizing such deviation, substitution, or change. If the Subcontract Documents do not contain submittal requirements pertaining to the Subcontract Work, the Subcontractor agrees upon request to submit in a timely fashion to the Contractor for approval any shop drawings, samples, product data, manufacturers' literature or similar submittals as may reasonably be required by the Contractor, Owner or Architect Engineer.

_____  
CONTRACTOR (Signature)

HELDER PEREIRA  
(Print name and title)

Date 7/14/2022

_____  
SUBCONTRACTOR (Signature)

Ronald Hilton  
(Print name and title)

Date 7/14/2022

# EXHIBIT B

# Original Contract

**Attached is a true and correct copy of the renegotiated contract between Workforce7, Inc. and Excell Communications, Inc., dated June 2024, reducing the amount owed from $1,069,000 to $1,000,000**

<u>AGREEMENT AND GENERAL RELEASE</u>

This Agreement and General Release ("<u>Agreement</u>") is made and voluntarily entered into, and shall be effective, as of the date this Agreement is fully executed by each of the signatories and parties identified below (the "<u>Effective Date</u>") on behalf of EXCELL COMMUNICATIONS, INC., a corporation organized and existing under the laws of the State of Alabama and authorized to conduct business in the state of New York as a Foreign Business Corporation, having its principal place of business at 111 Express Street, Plainview, New York 11803 (the "<u>Contractor</u>") and WORKFORCE7 INC., having its principal place of business at 4226A White Plains Road, 3rd Floor, Bronx, NY 10466 (the "<u>Subcontractor</u>"). Contractor and Subcontractor each referred to as a "<u>Party</u>" and collectively as the "<u>Parties</u>."

**WHEREAS**, Subcontractor has furnished certain labor, materials, and/or equipment to the Contractor under one or more agreements, contracts, invoices, purchase orders, agreements, understandings, and other arrangements, whether written, oral, or implied (collectively, the "<u>Project Agreements</u>") between the Contractor and Subcontractor, including an agreement dates as of July 14, 2022, on behalf, and for the benefit of, CSC HOLDINGS, LLC, a Delaware limited liability company registered in the State of New York as a Foreign limited Liability Company, having its principal place of business at One Court Square, Long Island City, New York 11101 ("<u>CSC</u>"); and

**WHEREAS**, certain sums are due to the Contractor from CSC and CSC has agreed to pay Contractor (the "<u>CSC Funds</u>"); and

**WHEREAS**, certain sums are due to the Subcontractor from the Contractor, and the Parties, having negotiated in good faith, wish to terminate all such Project Agreements and to fully and finally settle all debts and claims under the terms and conditions set forth below.

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED**, the Parties intending to be legally bound, and in consideration of the promises, covenants, and agreements herein, and other good and valuable consideration as set forth herein, mutually agree as follows:

1. **No Admission of Liability; Compromise of Claims**. This Agreement is intended as a compromise and settlement of the Dispute. It is not intended to be, and shall not be deemed to be any evidence, admission or concession of liability, responsibility, fault, or wrongdoing whatsoever on the part of any of the Parties, the releasees or any other person or entity, but rather constitute a compromise and settlement of the Dispute.

2. **Settlement Payment.** For the consideration described herein, including the General Releases set forth below, the Parties agree that the total sum of One Million Dollars ($1,000,000.00) shall be paid by Contractor and Subcontractor (the "<u>Settlement Payment</u>") to settle all debts and claims between the Parties. The Settlement Payment shall be made by check(s) payable to Subcontractor sent by nationally recognized overnight courier to Subcontractor at the address set forth above and paid in six (6) installments as follows: the first (1st) installment in the amount of $200,000.00 to be made within seven (7) days from the Parties' exchange of this fully executed Agreement, followed by five (5) equal monthly installments on the same day of each subsequent month of $160,000.00 each, until the Settlement Payment to Subcontractor has been paid in full.

3. **Termination of Project Agreements.** The Parties agree that subject to receipt and clearance of the Settlement Payment by Subcontractor, the Project Agreements are hereby deemed terminated and neither Party shall hereafter have any rights or obligations to the other thereunder, except as expressly provided in this Agreement. For the avoidance of doubt, it is not the intention of the Parties to terminate any other active contracts between the Parties for the benefit of clients other than CSC.

4. **General Releases.** Upon the Settlement Payment having been paid to Subcontractor and cleared, each Party and their respective affiliates, officers, directors, employees, trustees, executors, representatives, predecessors, successors, agents, and assigns (collectively, the "<u>Releasor</u>") for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby forever and

unconditionally release and discharge the other Party, and its affiliates, officers, directors, employees, trustees, executors, representatives, predecessors, successors, agents, and assigns (collectively, the "<u>Released Parties</u>") from any and all claims, actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, obligations, controversies, agreements, promises, variances, trespasses, damages, judgments, liens, extents, executions, defenses, and demands whatsoever, of any kind or nature, in law, admiralty, or equity, whether known or unknown, which Releasor ever had, now has, or hereafter can, shall, or may have against any of the Released Parties for, upon, or by reason of any matter, cause, or thing whatsoever, including but not limited to with regard to the Project Agreements, from the beginning of the world to the day of the date of this RELEASE.

The Releasor for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby forever and unconditionally release and discharge CSC, and its affiliates, officers, directors, employees, trustees, executors, representatives, predecessors, successors, agents, and assigns (collectively, the "<u>CSC Released Parties</u>") from any and all claims, actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, obligations, controversies, agreements, promises, variances, trespasses, damages, judgments, liens, extents, executions, defenses, and demands whatsoever, of any kind or nature, in law, admiralty, or equity, whether known or unknown, which Releasor ever had, now has, or hereafter can, shall, or may have against any of the CSC Released Parties for, upon, or by reason of any matter, cause, or thing whatsoever, including but not limited to with regard to the Project Agreements, from the beginning of the world to the day of the date of this RELEASE.

Releasors acknowledge that they may hereafter discover facts different from, or in addition to, those which they now believe to be true with respect to any and all claims released in this Agreement. Nevertheless, releasors agree that the releases stated above shall be and remain effective in all respects, notwithstanding the discovery of different or additional facts. Releasors hereby waive any mistake of fact or law in any way related to this Agreement.

5. **Binding Nature of Agreement.** This Agreement shall be binding upon each of the Parties and upon their respective, representatives, successors and assigns, and shall inure to the benefit of each party and to their respective representatives, successors, and assigns. This Agreement shall be a fully binding and complete settlement between the Parties and all persons or entities represented by or claiming through them. This Agreement constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

6. **Authority and No Assignment**. Each of the Parties represents and warrants that (i) it has the power and authority to enter into this Agreement to grant the release contained herein and to perform its obligations hereunder; (ii) there has been no assignment, negotiation, hypothecation or other transfer or alienation of any claim being released hereunder; (iii) the execution of this Agreement by the individual whose signature is set forth at the end of this Agreement on behalf of such Party, and the delivery of this Agreement by such Party, have been duly authorized by all necessary corporate action on the part of such Party.

7. **Counterparts and Electronic Signatures.** This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original and all of which when taken together shall constitute the same instrument notwithstanding that the Parties may not have signed the same counterpart. This Agreement may be executed by facsimile, electronic mail, or pdf, each of which when executed and delivered shall be deemed an original, and which when taken together shall constitute one and the same instrument.

[SIGNATURE PAGE FOLLOWS]

SIGNATURE PAGE TO SETTLEMENT AGREEMENT & GENERAL RELEASE

**WORKFORCE7 INC.**

*/s/ Ronald Hilton*

By: Ronald Hilton

Title: CEO

**EXCELL COMMUNICATIONS, INC.**

*/s/ Abel Barbosa*

By: Abel Barbosa, CEO